**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COLLEEN M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 1287** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Colleen M. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 5, 7). Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case remanded, and the Commissioner filed a response brief in opposition. (Docs. 11, 18). After careful review of the record and the parties' respective arguments, the Court affirms the Commissioner's decision.

## BACKGROUND

Plaintiff applied for DIB on September 10, 2015, alleging disability since April 24, 2012 due to bipolar disorder, chronic obstructive pulmonary disease ("COPD"), arthritis, major depressive disorder, and major anxiety. (R. 80-81, 84, 95-96, 204-05, 226, 231-32, 274, 296). Born in 1964, Plaintiff was 47 years old at the time of the alleged onset date (R. 204, 226, 274, 296), making her a younger person (under age 50). 20 C.F.R. §

404.1563(c). Plaintiff subsequently changed age category (R. 120, 126) to that of a person closely approaching advanced age (age 50-54). 20 C.F.R. § 404.1563(d). Her date last insured was December 31, 2017. (R. 80, 95, 226, 274, 296).

The Social Security Administration denied Plaintiff's applications initially on December 10, 2015 and on reconsideration on March 21, 2016. (R. 93, 110, 136-38, 141-43). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Jessica Inouye on July 10, 2017, where Plaintiff was represented by counsel. (R. 13-79, 144-45). Both Plaintiff and Vocational Expert ("VE") James Radke testified at the hearing. (R. 13, 18-65, 70-79).

The ALJ denied Plaintiff's claims in a decision dated February 1, 2018. (R. 115-28). The ALJ found that Plaintiff's degenerative disc disease of the cervical spine, arthritis in the thumb metacarpal joint, bilateral carpal tunnel syndrome, asthma, COPD, depression, anxiety, panic disorder, posttraumatic stress disorder ("PTSD"), and marijuana dependence with cannabis induced anxiety and mood disorder are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 117-19). The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform less than the full range of light work as follows: lift and carry up to ten pounds frequently and 20 pounds occasionally; push and pull up to ten pounds frequently; sit, stand, and walk up to six hours; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; frequently use the bilateral upper extremities and hands and engage in gross and fine manipulation, meaning handling, fingering, and feeling; avoid concentrated exposure to pulmonary irritants; learn, understand, remember, and carry

out simple, routine work tasks and sustain them in two-hour increments throughout the work day; not engage in teamwork or tandem tasks; and tolerate occasional brief and superficial interaction with coworkers and the general public. (R. 119).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC could perform jobs that existed in significant numbers in the national economy, such as Mail Clerk, Cleaner, and Cafeteria Attendant. (R. 71-72, 127). As a result, the ALJ found that Plaintiff was not disabled from her April 24, 2012 alleged onset date through the date of the decision. (R. 115, 127). The Appeals Council denied Plaintiff's request for review on December 18, 2018 (R. 1-6), rendering the ALJ's February 2018 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) determining the mental RFC; (2) determining the physical RFC as to frequently using both arms and hands; (3) evaluating the opinion evidence; and (4) assessing the subjective symptom allegations. For reasons discussed below, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### I.     Governing Standards

#### A.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment

by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B.    Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II. Analysis

### A. Mental RFC

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in determining that she retains the mental RFC to: learn, understand, remember, and carry out simple, routine work tasks and sustain them in two-hour increments throughout the work day; not engage in teamwork or tandem tasks; and tolerate occasional brief and superficial interaction with coworkers and the general public. (R. 119). A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must

explain how he has reached his conclusions."  *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

Plaintiff asserts that the mental RFC "does not properly accommodate her non-exertional limitations."  (Doc. 11, at 8, 11).  She first challenges the ALJ's underlying determination that she has no more than mild or moderate limitation in each area of mental functioning.  (*Id.* at 9-10).  Specifically, the ALJ found that Plaintiff has: mild limitation of concentration, persistence, or pace; moderate limitation in interacting with others; mild limitation as to understanding, remembering, or applying information; and moderate limitation in adapting or managing oneself.  (R. 118).  Plaintiff objects that the evidence supports greater restrictions in all areas.[1]

With regard to the finding of mild limitation of concentration, persistence, or pace, the ALJ recognized Plaintiff's claimed difficulties focusing, following instructions, and concentrating, but relied on her "typically" normal attention and concentration as well as the absence of evidence of distractibility.  (R. 118, 120).  Plaintiff claims that the following medical records contradict this finding: (1) on mental status examinations from August to October 2015, psychiatrist Ok Ro Hong, M.D. noted that Plaintiff presented with poor concentration, insight, and judgment, as well as anxious and sad mood, and he assigned her a Global Assessment of Functioning ("GAF") score of 50, connoting serious

---

[1]     Though Plaintiff appears to frame this as a step 3 Listing argument, she also states that she "does not necessarily argue that she should have been found disabled" at step 3, contending instead that "the ALJ's reliance upon false equivalencies at this juncture provided the shaky and untenable foundation for her mental RFC assessment."  (Doc. 11, at 9).  The Court finds no error in the ALJ's conclusion that Plaintiff is not presumptively disabled at step 3, and Plaintiff has waived any argument to that effect.  *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (" . . . 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .'") (quotation omitted).

symptoms;[2] and (2) when Plaintiff was hospitalized with major depressive order for four days in early January 2016, a mental status examination noted hyperactive psychomotor activity and impaired insight/judgment.  (Doc. 11, at 9-10; R. 397-98, 400, 470, 661, 666).

To begin, Plaintiff incorrectly states that the January 2016 examination indicated reduced attention and concentration (Doc. 11, at 10), but the record actually stated "attentive" attention and concentration—as the ALJ noted.  (R. 122, 470).  In addition, the ALJ expressly acknowledged the negative mental findings from Dr. Hong and the hospitalization (R. 121-22), but found them inconsistent with other medical evidence showing that Plaintiff was doing well.  For example, from July 2015 to March 2016, Plaintiff's therapist routinely found her mental functioning to be mostly normal.  (R. 121, 448, 450, 453-47, 640, 642-48).  Those findings included Plaintiff's consistently good attention on each mental status examination performed after the January 2016 hospitalization.  (R. 646-48).  Plaintiff also presented with a normal mental status during a November 2015 consultative internal medicine examination with Roopa Kari, M.D.  (R. 122, 464).  And  Paula Karnick, APN, who provided Plaintiff with psychiatric treatment on a handful of occasions from May to July 2016, noted normal concentration, and Plaintiff consistently reported that her symptoms were "largely resolved as a result of taking

---

[2]	"The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level."  *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)).  In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting DSM 16 (5th ed. 2013)).  "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011).

medications[.]"  (R. 123-24, 674-80).  Plaintiff fails to address this evidence or explain how it supports more than mild limitations in concentration, persistence, or pace.

More importantly, the ALJ adopted the restrictions set forth by two state agency reviewing physicians designed specifically to address even moderate deficiencies in this area.  (R. 87, 102, 121-22).  On November 18, 2015, Kirk Boyenga, Ph.D. found that: Plaintiff was capable of performing simple tasks; her social skills were impaired, but allowed settings with reduced interpersonal contact; her adaptation abilities were limited, but allowed routine, repetitive tasks; and she could follow instructions and leave home alone.  (R. 90, 121-22).  On March 11, 2016, Gayle Williamson, Psy.D. reached the same conclusion, adding that Plaintiff was able to complete four to five step tasks with sufficient pace/persistence and concentration within a normal work schedule.  (R. 107-08, 122). Consistent with these findings, the ALJ limited Plaintiff to: learning, understanding, remembering, and carrying out simple, routine work tasks; not engaging in teamwork or tandem tasks; and having only occasional brief and superficial interaction with coworkers and the general public.  (R. 119, 125).  Plaintiff does not point to any physician who imposed greater functional limitations, nor does she identify additional restrictions the ALJ should have included in the RFC finding.

Plaintiff instead complains that the state agency reviewing physicians' opinions as to her mental functioning were outdated and so unreliable.  (Doc. 11, at 14-15).  The ALJ recognized that Drs. Boyenga and Williamson "gave their opinions in late 2015 and early 2016 respectively" but found them "still applicable since [Plaintiff's] mental health did not worsen since that time."  (R. 125).  Both doctors rendered their opinions after Plaintiff's August to October 2015 treatment with Dr. Hong, and they noted his records assigning a

8

GAF score of 50.  (R. 87, 102-03).  Dr. Williamson also gave her opinion after Plaintiff's January 2016 hospitalization, which she noted as well.  (R. 102-03).

As discussed above, evidence since Plaintiff's hospitalization showed improvement in her mental functioning with further treatment.  As the ALJ explained, moreover, Drs. Boyenga and Williamson possessed "expertise in the field of psychiatry."  (R. 125).  In such circumstances, the ALJ did not err in giving these opinions "good weight" and "substantial merit."  (*Id*.).  *See Sanders v. Astrue*, 879 F. Supp. 2d 930, 940 (N.D. Ill. 2012) ("Where the record does not contain opinion evidence from a treating source, the ALJ may give substantial weight to the state agency reviewing physician opinion consistent with other medical evidence."); *see also* SSR 96-6p, 1996 WL 374180, at *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [SSA].").

As for interacting with others, the ALJ found that Plaintiff has no more than moderate limitation.  (R. 118).  Contrary to Plaintiff's suggestion (Doc. 11, at 9), the ALJ expressly acknowledged her claims that she was unable to leave her room most days, had anxiety attacks, and could not be around other people.  (R. 19-20, 25-27, 120, 262-70).  The ALJ also considered the treatment records that Plaintiff cites (Doc. 11, at 9), which document: an emergency room visit for depression in October 2013, at which time she was tearful; the January 2016 hospitalization, at which time she was very tearful; and individual therapy sessions from July 2015 to March 2016, including mental status examinations noting sad mood.  (R. 120-22, 328-29, 448, 453-457, 469-471, 640, 642-648).  As discussed above, however, Plaintiff ignores records otherwise showing mostly

normal mental status examinations and improvement with further treatment. She also ignores the opinions from Drs. Boyenga and Williamson finding her capable of working in settings with reduced interpersonal contact despite moderate limitations in interacting with others. The ALJ incorporated these restrictions into the RFC finding by limiting Plaintiff to: no teamwork or tandem tasks; and only occasional brief and superficial contact with coworkers and the public. (R. 119, 121-22, 125).

Plaintiff argues that the ALJ nonetheless erred in relying on her good rapport, cooperation, and apparent comfort during medical appointments to support a moderate finding in terms of interaction with others, speculating that she would not fare so well outside of a "protected setting[.]" (Doc. 11, at 9). But no physician indicated that Plaintiff needed a "protected" environment or required any additional functional restrictions in a work setting. To the contrary, consistent with the RFC assessment, Plaintiff testified that she had no difficulty interacting with authorities. (R. 48, 63-64).

With respect to finding mild limitation as to understanding, remembering, or applying information, the ALJ acknowledged Plaintiff's reported difficulties remembering things, completing tasks, and following instructions. (R. 118, 120). But the ALJ relied on Plaintiff's abilities to provide health information, describe her work history, and comply with treatment, together with the fact that there was "no mention" of memory problems in the record. (*Id.*). Plaintiff once again criticizes this finding as relying on "the false equivalency of comparing abilities in a brief and safe context with limitations that would certainly have a negative impact in a full time work environment." (Doc. 11, at 9). However, Plaintiff does not contest that she was able to engage in the activities listed,

does not identify treatment records that documented memory deficits, and cites no evidence of a greater degree of limitation.

In the final area of adapting or managing oneself, the ALJ found Plaintiff moderately limited because notwithstanding her depressed, anxious, and sad mood and affect, she exhibited no problems controlling her temper, getting along with providers and staff, and maintaining appropriate grooming and hygiene. (R. 118). Plaintiff dismisses this finding, too, as "a false equivalency," saying "the 'apples' simply cannot serve to undermine the 'oranges.'" (Doc. 11, at 10). Again, Plaintiff does not dispute that she was able to behave as described and cites no evidence of a greater degree of limitation. Moreover, the only physicians who weighed in on this issue, Drs. Boyenga and Williamson, both agreed that Plaintiff's limitations in this area still allow her to perform routine, repetitive tasks. (R. 90, 107-08). The ALJ did not err in incorporating these findings into the mental RFC determination.

Plaintiff next insists that the mental RFC is flawed to the extent it provides that she is able to sustain tasks in two-hour increments throughout the work day. (R. 119). Specifically, Plaintiff argues that this restriction "appears to be invalid on its face, particularly in light of vocational testimony that the individual would have to be on task at least 90 to 95 per cent of a work day," because the ALJ "did not specify how much time would separate the two hour increments, or how Plaintiff would spend that time[.]" (Doc. 11, at 8, 13). The Commissioner concedes that "the ALJ did not provide further discussion regarding this limitation," but argues that "any error in this regard is harmless" because "[c]ommon[ ]sense" suggests that this restriction "was consideration of the usual two breaks and lunch time generally provided in most jobs, as this court has recognized."

(Doc. 18, at 8-9). By way of support, the Commissioner directs the Court to several cases where the RFC finding specified "normal" breaks of two 15-minute breaks after two hours of work and one 30-minute break mid-shift, or the VE testified that "customary" breaks include two 15-minute breaks and one 30-minute lunch break. *Carlota R.M. v. Saul*, No. 18 C 2873, 2019 WL 3410222, at *1 (N.D. Ill. July 29, 2019); *Jones v. Berryhill*, No. 17 C 5646, 2018 WL 3827359, at *1 (N.D. Ill. Aug. 10, 2018); *Daniel S. v. Saul*, No. 18 C 5048, 2019 WL 3562661, at *4 n.13 (N.D. Ill. July 31, 2019); *see also Jodi L. v. Berryhill*, No. 17 C 50235, 2019 WL 354962, at *2 (N.D. Ill. Jan. 29, 2019). Plaintiff rejects the Commissioner's theory, questioning why a restriction to two-hour increments would be necessary if it simply represents ordinary breaks. (Doc. 19, at 1).

The Court agrees that the ALJ should have articulated the basis for finding that Plaintiff can work in two-hour increments, and made clear whether this was meant to account for regular breaks. Nevertheless, any error the ALJ made in that regard was harmless because no physician of record suggested that Plaintiff would be incapable of focusing for two hours at a time. As discussed, the ALJ reasonably accepted the state agency reviewers' opinions that Plaintiff can sustain simple, routine, repetitive tasks throughout a normal workday, and Plaintiff proffers no evidence supporting her claimed need for more frequent breaks than once every two hours. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (reaffirming that harmless error doctrine applies to social security cases); *McKinzey*, 641 F.3d at 892 ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

Plaintiff finally asserts that her "job history alone, with her work preclusive absenteeism, suffices as demonstrable evidence that Plaintiff would be unable to sustain even the most basic requirements of full time work." (Doc. 11, at 10). Plaintiff worked as an airline reservation agent from 1994 to the April 24, 2012 alleged onset date, at which time her employment was terminated due to absenteeism. (R. 18-19, 32, 232, 251). Plaintiff cites no authority holding that this Court may (or should) consider her history of being absent from work in 2012 as evidence of persistent disabling functional limitations in subsequent years where treatment records show her condition improved since her prior employment was terminated.

Viewing the record as a whole, the ALJ did not err in assessing Plaintiff's mental RFC, and the case need not be remanded for further consideration of that issue.

## B. Physical RFC

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that she retains the physical RFC to frequently: use her bilateral upper extremities and hands; and engage in gross and fine manipulation, meaning handling, fingering, and feeling. (R. 119). Plaintiff contends that the record contains "substantial evidence that this would be impossible," namely, treatment records "document[ing] dire and increasingly worsening findings in [her] bilateral upper extremities, particularly her hands and wrists." (Doc. 11, at 11-13).[3] The Court disagrees.

---

[3] To the extent Plaintiff also vaguely suggests that "she would be unable to sustain the lifting requirements or other upper extremity functions" (Doc. 11, at 13), she fails to separately develop or support—and therefore waives—any such argument. *See Crespo*, 824 F.3d at 674. In any event, the ALJ acknowledged her claimed "difficulty lifting objects due to arthritis in both hands." (R. 120, 262).

In support of her argument, Plaintiff relies on treatment records regarding hand and wrist problems in 2012 and from 2015 to 2017, but ignores other evidence showing improvement in her symptoms following surgeries in December 2016 and April 2017. In February 2012 (before the April 24, 2012 alleged onset date), EMG/NCS results revealed electrodiagnostic evidence of left median mononeuropathy at the level of the wrist involving the sensory fibers, consistent with mild left carpal tunnel syndrome. (R. 120, 392). On examination in July 2012 (after the alleged onset date), Plaintiff had tenderness to palpation ("+TTP") over the right medial epicondyle and pain with resisted wrist flexion. (R. 120, 606).

Despite these findings, Plaintiff did not receive further treatment for hand and wrist pain for more than three years. (R. 380-85). On September 23, 2015, Plaintiff was diagnosed again with carpal tunnel syndrome on the left, presumed on the right as well, and she was prescribed medication and wrist splints. (R. 121, 384). In November 2015, consultative examiner Dr. Kari noted tenderness in the thumbs near the "CMC" and "MCP" joints as well as decreased sensation to pinprick in both hands, but she observed that Plaintiff had normal grip strength, could make fists and oppose her fingers, and displayed normal range of motion of the cervical spine. (R. 122, 464). Dr. Kari also noted 5/5 strength in both arms and normal range of motion of the shoulders, elbows, and wrists. (R. 464). Dr. Kari diagnosed arthritis in the thumbs. (R. 122, 465). As of December 2015, Plaintiff was not undergoing physical therapy, and there was no plan to do so. (R. 122, 629).

Plaintiff received treatment for primary osteoarthritis in both hands through early February 2016, specifically including orthotics to limit thumb opposition, reduce

associated pain, promote healing, and prevent degradation of symptoms. (R. 122, 626-630). After that, she did not receive additional treatment for hand and wrist problems for more than four months. On examination in late June 2016, Plaintiff had positive Tinel sign of the wrists and pain in the base of the thumb, and she was diagnosed with osteoarthritis of the basilar joint of the thumb and carpal tunnel syndrome. (R. 123, 742). Later the same month, Plaintiff was seen for numbness and tingling in the upper extremities, and she reported "N&P" in her fingers that radiated up her arm and neck despite wearing wrist splints. (R. 123, 750). The examination was notable for positive Tinel sign in both wrists, and Plaintiff was diagnosed with mild to moderate bilateral carpal tunnel syndrome with dramatic sensory symptoms. (R. 123, 754-55).[4] On examination in September 2016, Plaintiff again had positive Tinel sign of the wrists and pain in the base of the thumb with restricted range of motion. (R. 123, 725).

From October 2016 to May 2017, Plaintiff treated with orthopedic surgeon Charles O'Laughlin, Jr., M.D. for bilateral wrist pain. (R. 123-24, 772-79). On examination in October 2016, Dr. O'Laughlin observed good circulation, negative Allen's test for both wrists, positive Phalen's test, increased numbness and tingling with 20 seconds of wrist flexion, positive cubital tunnel flow elbow flexion test, numbness in both arms after 30 seconds of flexion, and a negative Tinel sign across the course of the ulnar nerve and median nerve on both extremities. (R. 123, 772-773). Dr. O'Laughlin also noted that Plaintiff appeared to have good strength, she did not display a lot of thenar atrophy, range

---

[4]     Plaintiff states that, at this time, an MRI of the cervical spine revealed cervical stenosis (Doc. 11, at 12, citing R. 750, 754), but that is not what the record said. Rather, June 2016 treatment notes stated: "MRI C-Spine C6-7 DDD, cervical stenosis vs spinal cord deformity[.]" (R. 754). Prior treatment notes dated February 2012 included the same statement. (R. 392). As such, it is not clear that an MRI was performed in June 2016 (or at another time) or that a diagnosis of cervical stenosis was made.

of motion was very good in both wrists without crepitus, and the thumb moved pretty well. (R. 773). He diagnosed bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome of both elbows, and ordered x-rays of both wrists and EMG/NCV studies of both upper extremities. (R. 123-24, 773).

The EMG/NCV studies showed electrophysiological evidence of bilateral median neuropathy across both wrists (characterized as carpal tunnel syndrome), moderate on the left and mild on the right, and no evidence of cervical radiculopathy. (R. 124, 650-51). The x-rays of the wrists showed a lot of arthritis at the base of the thumb. (R. 124, 774). On examination in November 2016, Dr. O'Laughlin noted a positive grind test as well as limitation of abduction and adduction at the base of the thumb. (R. 124, 774).

On December 7, 2016, Plaintiff underwent carpal tunnel release of the right wrist and carpometacarpal arthroplasty of the right thumb. (R. 124, 788-789). On January 26, 2017, Dr. O'Laughlin noted that Plaintiff was "pleased with her early result but still ha[d] a lot of healing to do" and prescribed physical therapy. (R. 775-77). Primary care treatment notes on February 2, 2017 stated that Plaintiff was "doing very well" after the surgery. (R. 711-16). And, on February 23, 2017, Dr. O'Laughlin noted that Plaintiff had undergone therapy, had improved markedly, was happy with the results, could use the hand comfortably, and could oppose all fingers to the thumb. (R. 124, 778). She received weekly occupational therapy from February 2, 2017 to March 6, 2017, and, on discharge, her response to therapy and progress toward established goals were both "[e]xcellent[.]" (R. 870-901, 915-32).

The following month, on April 14, 2017, Plaintiff underwent carpal tunnel release of the left wrist and arthroplasty of the left thumb. (R. 124, 943-944). While the record

contains no further treatment notes documenting her functioning after the April 2017 procedures, Plaintiff testified at the administrative hearing that she was able to knit for longer periods of time and garden. (R. 22-23, 30, 33-39, 124).[5] She also agreed with the ALJ that the surgeries were successful. (R. 34). Plaintiff additionally testified that she had stopped baking and horseback riding because of the surgeries, but planned to resume those activities. (R. 56-58).

Plaintiff does not address any of the evidence of her improved functioning after the surgeries. Nor does she explain how (if at all) this evidence supports her claims of continued, disabling symptoms. Plaintiff also cites no other evidence to support any additional functional limitations that the ALJ did not include in the physical RFC finding.

For all of these reasons, the ALJ's physical RFC determination is supported by substantial evidence, and Plaintiff's request to remand the case for further consideration of this issue is denied.

### C. Opinion Evidence

Plaintiff next argues that the ALJ erred in weighing the opinion evidence of record. In weighing a medical opinion, the ALJ evaluates its consistency with the record as a whole. 20 C.F.R. § 404.1527(c)(4); *see Sanders*, 879 F. Supp. 2d at 940. Plaintiff first objects that the ALJ accorded too little weight to the GAF score assigned by Dr. Hong. (Doc. 11, at 14). She also contends that the ALJ gave too much weight to the opinion of the state agency consultant regarding her physical functioning. (*Id.* at 15).

### 1. GAF Score

---

[5]     Although the ALJ stated that Plaintiff previously could not garden (R. 124), her testimony indicated that she had done some gardening but not as well, or for as long, as she liked. (R. 35).

Plaintiff argues that the ALJ improperly "dismissed" the GAF score assigned by Dr. Hong from August to October 2015. (Doc. 11, at 14). In fact, the ALJ addressed this evidence in some detail and provided good reasons for finding that it was "of limited value." (R. 121, 125). "Courts have explained again and again that GAF scores do not always reflect a psychiatrist's assessment of the claimant's functional capacity." *Stone v. Colvin*, No. 13 C 5171, 2015 WL 2265793, at *3 (N.D. Ill. May 13, 2015). "'GAF scores are intended to be used to make treatment decisions . . . not as a measure of the extent of an individual's disability.'" *Id.* (quoting *Martinez v. Astrue*, No. 09 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010)). GAF scores measure both severity of symptoms and functional level. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Because the final rating "always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity." *Id.* (internal quotation omitted). Accordingly, the regulations and case law do not require an ALJ to make a disability determination based solely on a claimant's GAF score. *Id.*

Consistent with the foregoing authority, the ALJ explained that the GAF score represents a clinician's subjective evaluation at a single point in time, provides no indication of overall functioning over an extended period, is often determined during a period of significant problems, and may vary between practitioners or from one time to another. (R. 124-25). The Court finds no error in this analysis. Significantly, Plaintiff cites no other evidence to support additional functional limitations that the ALJ did not include in the mental RFC determination.

## 2. Physical RFC Opinion

Turning to the physical RFC, Calixto Aquino, M.D. opined on March 14, 2016 that Plaintiff: could lift and carry 50 pounds occasionally and 25 pounds frequently; could stand, walk, and sit for about six hours in an eight-hour workday; was unlimited with respect to pushing and pulling; could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; was unlimited with respect to balancing; could frequently stoop, kneel, crouch, and crawl; had no manipulative, visual, or communicative limitations; and needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 104-06, 122-23).[6] The ALJ accorded this opinion "some weight with greater weight being given to the fact that he finds [Plaintiff] has a reduced [RFC] due to her physical impairments and must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." (R. 125). The ALJ otherwise gave the opinion "lesser weight" because, based on the medical evidence, Plaintiff was more restricted due to degenerative disc disease, arthritis, and carpal tunnel syndrome than Dr. Aquino indicated. (*Id*.). The ALJ concluded that Dr. Aquino's opinion nevertheless "contribute[d] to the overall narrative" that Plaintiff was not disabled. (*Id*.).

Plaintiff questions the "reliability" of an opinion "deemed to be so off the mark regarding a majority of [her] physical limitations." (Doc. 11, at 15). This is not a fair characterization of Dr. Aquino's opinion or the ALJ's assessment of it. The ALJ set forth why she accepted portions of this opinion but nonetheless found Plaintiff more limited than the doctor suggested. As the Seventh Circuit has explained, " . . . an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular

---

[6]     The ALJ indicated that Dr. Aquino restricted Plaintiff to occasionally lifting and carrying 15 (as opposed to 50) pounds, and failed to mention the 25-pound limitation for frequent lifting and carrying, but otherwise correctly conveyed the restrictions. (R. 122).

physician's opinion . . . . " *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The ALJ—not a physician—is responsible for constructing the RFC assessment, and the ALJ must do so with "a proper medical ground" and explain how she reached her conclusions. *See Amey*, 2012 WL 366522, at *13. Here, the ALJ did so. Notably, Plaintiff cites no contrary opinion or other evidence that supports additional functional limitations that the ALJ did not include in the physical RFC determination. Plaintiff's request to remand the case for further consideration of this opinion concerning her physical RFC is denied.

### D. Subjective Statements

Plaintiff finally challenges the ALJ's assessment of her subjective symptom allegations. (Doc. 11, at 13-14). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . . " *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v.*

*Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 Fed. Appx. 16, 20 (7th Cir. 2018).

Plaintiff claimed that she had problems leaving her room most days; suffered from anxiety attacks; could not be around other people; and had deficits in memory, concentration, completing tasks, following instructions, and getting along with others. (R. 18-20, 24-27, 32, 119, 262, 267). She also said that she had difficulty lifting objects due to arthritis in her hands. (R. 119, 262, 267). In discounting Plaintiff's statements about her mental and physical health problems, the ALJ first noted that she received "essentially routine and/or conservative treatment[.]" (R. 124).

With regard to Plaintiff's mental impairments, the ALJ found it significant that she had only one in-patient psychiatric hospitalization in January 2016 (and none since that date), and she routinely reported to her psychiatrist, Karnick, that her mental health symptoms were largely resolved as a result of taking medications. (R. 124, 674-77). Plaintiff's speculation that the ALJ somehow decided "she must be cured" finds no support in the record. (Doc. 11, at 13-14). The ALJ acknowledged that Plaintiff had deficits in mental functioning, but not to an extent that would preclude work. (R. 124). Plaintiff does not dispute that she had no additional psychiatric hospitalizations after January 2016 and then consistently reported improvement with medication. (R. 123-24).

As for Plaintiff's physical impairments, the ALJ stressed that after she had surgery on both wrists and thumbs, the medical evidence showed substantial improvement. (R.

124).  For example, in late February 2017, Dr. O'Laughlin noted that after undergoing right-hand surgeries, Plaintiff had improved markedly, was happy with the results, could use the hand comfortably, and could oppose all fingers to the thumb.  (R. 124, 778).  And after also undergoing left-hand surgeries, Plaintiff testified that she was able to knit for longer periods of time and garden.  (R. 22-23, 30, 33-39, 124).  On this record, there is no merit to Plaintiff's claim that the ALJ simply disregarded the surgeries as "irrelevant." (Doc. 11, at 14).  The ALJ acknowledged that Plaintiff had deficits in physical functioning, but not to an extent that would preclude work.  (R. 124).  Plaintiff does not dispute that her condition improved after the surgeries, and she cites no contrary evidence supporting her claims of disabling wrist and hand limitations.  (R. 124).

The ALJ also explained that notwithstanding occasional exacerbations, Plaintiff's COPD and asthma were well controlled with medication.  (R. 124).  Contrary to Plaintiff's assertion, this does not reflect "a leap of logic that is unexplained and inexplicable."  (Doc. 11, at 14).  The ALJ relied on specific medical evidence to support her conclusion, including: on examination in December 2014, Plaintiff's lung auscultation revealed mild wheezing, and she was diagnosed with COPD and prescribed medications; on examination in April 2015, Plaintiff was in no respiratory distress, had normal respiratory rate and effort, had no accessory muscle use, and her breath sounds were clear to auscultation bilaterally; in November 2015, Plaintiff told consultative examiner Dr. Kari that she experienced shortness of breath when outdoors but inhalers helped; in September and October 2016, pulmonary examinations were normal; and, as of February 2017, there was "little difference" in her "overall condition[.]"  (R. 121-23, 417, 423, 463, 711, 714-15, 720, 730).  Consistent with this assessment, treatment records after

December 2014 consistently documented completely normal pulmonary exams and stated that Plaintiff's condition was stable and controlled with ("c/w") medication. (R. 407-08, 417, 422, 500, 505, 510-11, 517, 523, 711, 714-16, 720, 725, 730, 736, 742, 747). And Plaintiff testified that her COPD did not cause limitations if she took medication. (R. 61). She does not dispute that her breathing problems were managed with medication and cites no contrary evidence.

An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013)). And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Viewing the record as a whole, the ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling symptoms, and substantial evidence supports that decision.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's request to affirm the ALJ's decision is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: March 4, 2021

_____
SHEILA FINNEGAN
United States Magistrate Judge